## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

```
------------------------------------------------------X
PHILADELPHIA INDEMNITY INSURANCE
COMPANY,

                    Plaintiff,

        -against-

PROVIDENCE COMMUNITY ACTION
PROGRAM, INC., THOMAS S.
HEMMENDINGER, FRANK CORBISHLEY,
and WILLIAM BENTLEY,

                    Defendants.
------------------------------------------------------X
```

Case No.: _____


**COMPLAINT FOR**
**DECLARATORY JUDGMENT**

**JURY TRIAL DEMANDED**


Plaintiff PHILADELPHIA INDEMNITY INSURANCE COMPANY, by and through its

attorneys, Sedgwick LLP and Morrison Mahoney LLP, as and for its Complaint against

Defendants, PROVIDENCE COMMUNITY ACTION PROGRAM, INC., THOMAS S.

HEMMENDINGER, FRANK CORBISHLEY, and WILLIAM BENTLEY, hereby alleges as

follows:

### A.   Nature of the Action

1.      This is an action seeking declaratory relief pursuant to 28 U.S.C. § 2201 and § 2202,

for the purpose of resolving a dispute about the obligation of Philadelphia Indemnity Insurance

Company ("Philadelphia"), if any, under an insurance policy issued to Providence Community

Action Program, Inc. ("ProCAP") to indemnify Frank Corbishley (ProCAP's former executive

director) or William Bentley (ProCAP's former chief operating officer).  Such relief is requested

due to the existence of an actual controversy between the parties. Specifically, Philadelphia seeks

a declaration that it has no duty to defend or indemnify either Corbishley or Bentley for a claim

made against them by Thomas S. Hemmendinger, acting in his capacity as ProCAP's receiver, for breach of their fiduciary duty to ProCAP.

### B.    Parties

2.    Plaintiff Philadelphia is an insurance company that is organized under the laws of the Commonwealth of Pennsylvania with its principal place of business in the Commonwealth of Pennsylvania.

3.    Defendant ProCAP is a Rhode Island not-for-profit corporation with its principal place of business in Rhode Island.  Defendant Thomas S. Hemmendinger is ProCAP's receiver.

4.    Upon information and belief, Defendant Frank Corbishley is a resident of Rhode Island and a former employee, executive, officer or director of ProCAP.

5.    Upon information and belief, Defendant William Bentley is a resident of Rhode Island and a former employee, executive, officer or director of ProCAP.

### C.    Jurisdiction and Venue

6.    This is an action for declaratory judgment under 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

7.    This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 and the parties are diverse.

8.    Venue is proper in this district under 28 U.S.C. § 1391 as all defendants are Rhode Island residents and a substantial part of the events giving rise to this claim occurred in this judicial district.

### D.    Factual Allegations

### The Philadelphia Policy

9.    Philadelphia provided ProCAP with a "Flexiplus Five" insurance policy, Policy No. PHSD619786, for the period June 6, 2011 to June 8, 2012 ("the Policy").   Part 1 of the Policy

DOCS/18100676v1

includes coverage, on a claims-made basis and as limited by the Policy's terms and conditions, for Directors and Officers liability. A true and correct copy of the Policy issued to ProCAP is attached hereto as **Exhibit A**.

10.    The limit of liability for Philadelphia under the Policy's Directors and Officers coverage is $1,000,000 for each policy period.

11.    In relevant part, the Policy's Insuring Agreements in Part 1 provide that:

> A.    [Philadelphia] will pay on behalf of the **Individual Insured, Loss** from **Claims** made against Individual Insureds during the **Policy Period** (or, if applicable, during the Extension Period), and reported to [Philadelphia] pursuant to the terms of this Policy, for **D&O Wrongful Acts**, except to the extent the **Organization** has indemnified the **Individual Insureds** for such **Loss**.
> …

12.    The Policy's Common Policy Definitions section, as amended and in relevant part, states that:

> B. **Claim** means for the purposes of Parts 1, 2, 3, and 5:
>
> > 1. any written demand for monetary or non-monetary relief; or
> >
> > 2. any judicial, civil, administrative, regulatory, or arbitration proceeding (including any appeal there from), which subjects an **Insured** to a binding adjudication of liability for monetary or non-monetary relief for a **Wrongful Act; or**
> >
> > …
>
> F. **Individual Insured** means:
>
> > 1. any individual who has been, now is or shall become a director, officer, governor, trustee, equivalent executive, employee (whether salaried or not), volunteer, leased or temporary employee, or committee member of the **Organization …;**
> >
> > …

3

5. Independent Contractors

Thomas S. Hemmendinger[1]
Independent Contractor means an individual who is contracted to perform services for the Organization; provided that such individual shall be deemed an Employee only if and to the extent that the Organization provides indemnification to such individual for services rendered as if they were rendered by an actual Employee of the Organization, and provided further that such individual(s) are known to the Underwriter. This Policy does not cover any Loss which any Insured is obligated to pay an Independent Contractor for overtime pay, vacation pay, or any employee benefit.

G. **Insured** means the **Organization** and **Individual Insured**.

…

I. **Loss** means:
   1. **Damages;**
   2. **Defense Cost;**

…

J. **Organization** means:
   1. the **Parent Organization,**
   2. any **Subsidiary,**

…

K. **Parent Organization** means the first entity named in Item 1 of the Declarations Page.

13.   The Policy's Common Policy Exclusions section states, in relevant part, that:

[Philadelphia] shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the Insured:

…

J. brought or maintained by, at the behest, or on behalf of the **Organization;…**

---

[1] A further notation in the Policy states "Effective 12/22/2011 Thomas S. Hemmendinger has been added as an independent contractor."

4

14.     As modified by the Policy's Pro-Pak Elite Enhancement Endorsement: "Item J. will not apply to any **claim** brought as a derivative action, or similar action, on behalf of the **Organization,** provided the **claim** is brought without the assistance of any current or former **Individual Insured.**"

### The Underlying Claim

15.     On information and belief, ProCAP entered receivership in December 2011 and the Rhode Island Superior Court appointed Thomas S. Hemmendinger ("Hemmendinger" or "the Receiver") the permanent receiver for ProCAP on January 4, 2012.

16.     On February 22, 2012, counsel for the Receiver notified Philadelphia that the Receiver, acting on behalf of ProCAP, might assert claims against Corbishley or other former ProCAP employees "for various acts, errors, omissions, statements, neglect and breaches of duty with respect to ProCAP's assets, operations and financial affairs."

17.     On March 24, 2012, Philadelphia sent a reservation of rights letter to the Receiver which reserved Philadelphia's right to limit coverage in whole or in part and relied, among other provisions, upon the Policy's Exclusion J.

18.     On June 6, 2012, counsel for the Receiver sent Philadelphia a demand for payment to ProCAP of $1,000,000.00 "for Loss from Claims for D&O Wrongful Acts pursuant to Section 1C of Part 1" of the Policy.  This letter explained that ProCAP's claim arose from breaches of duty by Corbishley, Bentley, and "possibly other Insured Individuals."

19.     On May 8, 2014, counsel for Corbishley and Bentley tendered to Philadelphia the defense of a threatened Claim against them by ProCAP.

5

DOCS/18100676v1

20.     On or about June 13, 2014, the Receiver filed suit against Corbishley and Bentley in Rhode Island Superior Court ("the Underlying Claim").  A copy of the complaint in that action is attached as **Exhibit B**.

21.     The Receiver's complaint in the Underlying Claim alleged that Corbishley and Bentley had violated "a fiduciary duty to ProCAP and a duty to exercise due care in the performance of their duties and obligations to manage, direct, and supervise the operations and finances of ProCAP."

22.     On August 15, 2014, Philadelphia agreed to defend Corbishley and Bentley against the Underlying Claim, subject to a full reservation of rights, specifically including the right to deny coverage based on Exclusion J of the Policy.

23.     On October 3, 2014, counsel for the Receiver sent another letter to Philadelphia, reiterating its demand for $1,000,000.00 to settle the Underlying Claim.

24.     On December 23, 2014, Philadelphia wrote to counsel for the Receiver and, among other things, notified the Receiver that Exclusion J applies to bar coverage for the Underlying Claim.

### E.  Count for Declaratory Judgment

25.     Philadelphia incorporates by reference all allegations contained in the preceding paragraphs of the Complaint as if set forth herein at length.

26.     The Receiver, Corbishley, and Bentley all qualify as "Individual Insureds" and as "Insureds" as defined in the Policy.

27.     ProCAP is a "Parent Organization" and an "Organization" as defined in the Policy.

28.     The Underlying Claim was brought or maintained by, at the behest of, or on behalf of ProCAP, and with the assistance of Hemmendinger.

DOCS/18100676v1

29.     Accordingly, Exclusion J of the Policy excludes all coverage for the Underlying Claim under the Policy.

30.     Philadelphia therefore contends that it is not obligated to defend or indemnify Corbishley or Bentley in the Underlying Claim.

31.     A justiciable controversy has arisen between Philadelphia, ProCAP (the Receiver), Corbishley, and Bentley regarding Philadelphia's rights and obligations under the Policy with respect to the Underlying Claim.  This justiciable controversy is within the jurisdiction of this Court and can be resolved by a declaratory judgment of this Court.

**WHEREFORE,** Philadelphia respectfully requests that the Court enter a declaratory judgment under 28 U.S.C. § 2201 and 28 U.S.C. § 2202 determining and declaring that Philadelphia does not have a duty under the Policy to defend or indemnify Corbishley or Bentley with respect to the Underlying Claim, and granting such other and further relief as the Court may deem just and equitable.

Dated:     September 15, 2015

**PHILADELPHIA INDEMNITY INSURANCE COMPANY,**

By its attorneys,

**MORRISON MAHONEY, LLP**

/s/ *Thomas M. Robinson*

Thomas M. Robinson, Esq. #6193
Ten Weybosset Street, Suite 900
Providence, RI 02903
Telephone: (401) 331-4660
Fax: (401) 351-4420
trobinson@morrisonmahoney.com

7

/s/ *J. Gregory Lahr, Esq.*
/s/ *William J. Brennan*

J. Gregory Lahr, Esq. (pro hac vice pending)
William J. Brennan, Esq. (pro hac vice pending)
SEDGWICK LLP
225 Liberty Street, 28th Fl.
New York, NY 10281
Telephone:  (212) 422-0202
Fax:  (212) 422-0925
Gregory.lahr@sedgwicklaw.com
William.brennan@sedgwicklaw.com

8

# Exhibit A

# POLICY CHANGE DOCUMENT

**POLICY NO.:** PHSD619786

| Philadelphia Indemnity Insurance Company | 3339 | TROY, PIRES & ALLEN LLC |
|---|---|---|

NAMED INSURED       Providence Community Action Program
                    ProCAP Housing Inc

MAILING ADDRESS     518 Hartford Ave
                    Providence, RI 02909-5848

POLICY PERIOD:      FROM   06/08/2011   TO   06/08/2012     at
                    12:01 A.M. Standard Time at your mailing address shown above.

CHANGE EFFECTIVE    12/22/2011          CHANGE #    1

DESCRIPTION

In consideration of the premium reflected, the policy is amended as indicated below:

Effective 12/22/2011 Thomas S. Hemmendinger has been added as an independent contractor

Path ID 5844006

Total Annual
Additional/Return Premium $            0.00          Total Prorate
                            NO CHANGE                 Additional/Return Premium $            0.00
                                                                                    NO CHANGE

COUNTERSIGNED                          BY

                    (Date)                              (Authorized Representative)

PI-MANU-1 (01/00)

## **THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

### INDEPENDENT CONTRACTORS

AMENDED DEFINITION OF INDIVIDUAL INSURED TO INCLUDE INDEPENDENT CONTRACTORS

This endorsement modifies insurance provided under the following:

Flexi Plus Five

Part 6 Common Policy Definitions, letter F Individual Insured is amended to include the following:

5. Independent Contractors

Thomas S. Hemmendinger
 Independent Contractor means an individual who is contracted to perform services for the Organization; provided that such individual shall be deemed an Employee only if and to the extent that the Organization provides indemnification to such individual for services rendered as if they were rendered by an actual Employee of the Organization, and provided further that such individual(s) are known to the Underwriter.  This Policy does not cover any Loss which any Insured is obligated to pay an Independent Contractor for overtime pay, vacation pay, or any employee benefit.

All other terms and conditions of this Policy remain unchanged.



# PHILADELPHIA
## INSURANCE COMPANIES
A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

04/09/2011

**Providence Community Action Program**
**ProCAP Housing Inc**
**518 Hartford Ave**
**Providence, RI 02909-5848**

RE: **PHSD619786**

Dear Valued Customer:

I wanted to personally thank you for choosing Philadelphia Insurance Companies (PHLY) for your insurance needs. Our first class customer service, national presence and A+ (Superior) A.M. Best financial strength rating have made us *the* selection by over 150,000 policyholders nationwide. I realize you have a choice in insurance companies and truly appreciate your business.

I wish you much success this year and look forward to building a mutually beneficial business partnership which will prosper for years to come. Welcome to PHLY and please visit our website to learn more about our Company!

Sincerely,

Christopher J Maguire
President & COO
Philadelphia Insurance Companies

CJM/sm

---



PHILADELPHIA
INSURANCE COMPANIES
A Member of the Tokio Marine Group

# Bell Endorsement & Crisis Management

## PHLY HAS INCREASED LIMITS...

**PHLY has increased limits on Bell Endorsement and created a Crisis Management Endorsement that will be attached to all of our policies.**

## Bell Endorsement

**$50,000 Identity Theft Expense** – coverage which reimburses the expenses of any director or officer who becomes a victim of an incident of identity theft.

**$50,000 Terrorism Travel Reimbursement** – which covers any director or officer for emergency travel expenses that he or she incurs in the event of a "certified act of terrorism".

**$50,000 Emergency Real Estate Consulting Fee** – coverage for realtor's fee or real estate consultant's fee necessitated by the Insured's need to relocate due to the "Unforeseeable destruction" of the Insured's principal location.

**$25,000 Temporary Meeting Space Reimbursement** – coverage for rental of meeting space which is necessitated by the temporary unavailability of the Insured's primary office space due to the failure of a climate control system, or leakage of a hot water heater.

**$50,000 Workplace Violence Counseling** – in the event that a violent incident occurs at any of the Insured's premises.

**$50,000 Kidnap Expense** – coverage for reasonable fees incurred as a result of the kidnapping of a Director or Officer or their spouse, "domestic partner", parent or child.

**$50,000 Key Individual Replacement Expenses** – coverage for the Chief Executive Officer or Executive Director who suffers an "injury" which results in the loss of life. No deductible applies to this coverage.

**$50,000 Image Restoration and Counseling** – coverage for image restoration and counseling arising out of "Improper Acts."

**$50,000 Donation Assurance** – coverage for "Failed Donation Claim(s)."

**$50,000 Business Travel** – coverage for Business Travel Accidental Death Benefit to the Named Insured if a Director or Officer suffers an "injury" while traveling on a common carrier for business.

**$25,000 Conference Cancellation** – coverage for any business-related conference expenses, paid by the insured and not otherwise reimbursed, for a canceled conference that an employee was scheduled to attend. The cancellation must be due directly to a "natural catastrophe" or a "communicable disease" outbreak that forces the cancellation of the conference.

**$25,000 Fundraising Event Blackout** – coverage for expenses that are incurred due to the cancellation of a fundraising event caused by the lack of electric supply resulting in a power outage, provided the fundraising event is not re-scheduled. The fundraising event must have been planned at least thirty (30) days prior to the power outage.

**$5,000 per employee; $25,000 policy limit Political Unrest** – coverage to reimburse any present director, officer, employee or volunteer of the named insured while traveling outside the United States of America for "emergency evacuation expenses" that are incurred as a result of an incident of "political unrest."

**$1,500 Travel Delay Reimbursement** – coverage to reimburse any present director or officer of the named insured for any "non-reimbursable expenses" they incur as a result of the cancellation of any regularly scheduled business travel on a common carrier.

## Crisis Management

**$25,000 Crisis Management** – coverage for "crisis management emergency response expenses" incurred because of an "incident" giving rise to a "crisis."

**The Enhanced Bell and Crisis Management Endorsements will be effective November 2009 for all approved states.**
All coverages are not available in all states due to state insurance regulations.

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Coverage(s) described may not be available in all states and are subject to Underwriting and certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds.
© 2010 Philadelphia Insurance Companies



PHLY.com


TOKIO MARINE GROUP



**PHILADELPHIA**
**INSURANCE COMPANIES**

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

## LOSS CONTROL SERVICES

Welcome to PIC Loss Control Services. PIC is familiar with the unique loss control programming needs of your organization and has achieved superior results in this area. We are committed to delivering quality and timely loss prevention services and risk control products to your organization. Customer satisfaction through the delivery of these professional products to achieve measurable risk improvement results is our goal. We know the fulfillment of our loss control commitment is not complete until we deliver upon our promises.

Our product specific service capabilities follow on the next few pages. They include a multifaceted approach to risk management covering safety program development, site audits and training (including interactive web-based training). We offer a wide range of products and value-added service at no cost to help you achieve your risk management goals.

Please take a moment to register for our website @ www.losscontrol.com to gain full access to these resources. Please assign yourself your own username and password. Your registration will be processed in two business days.

We look forward to helping to make your insurance program a success. We are standing by if you have any questions or if we may be of further assistance. Please contact us at:

Mark Konchan, CSP ARM
Vice President – Loss Control
Home Office – Bala Cynwyd, PA
E-Mail: mkonchan@phlyins.com



## Philadelphia Insurance Companies (PIC)
## PHLY Loss Control Services

### About Loss Control Services

- Our Motto
- Our Mission

### Risk Management Resources

- IntelliCorp Records, Inc. (Employment Background Screening and MVR Checks)
- Nonprofit Risk Management Center
- WEMED Loss Assistance Hotline
- AGOSNET: web-enabled EPLI (Employment Practices Liability Insurance) Risk Management Services

### Proprietary Risk Management Services

- Monthly E-Brochures

### Contact Information



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

# Philadelphia Indemnity Insurance Company

# Commercial Lines Policy

THIS POLICY CONSISTS OF:

- DECLARATIONS
- COMMON POLICY CONDITIONS
- ONE OR MORE COVERAGE PARTS. A COVERAGE PART CONSISTS OF:
- ONE OR MORE COVERAGE FORMS
- APPLICABLE FORMS AND ENDORSEMENTS

**IN WITNESS WHEREOF**, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

President and COO

Secretary

## POLICYHOLDER NOTICE (LOSS ASSISTANCE HOTLINE)

We are pleased to enclose an original copy of your policy.  Please take a moment to review the policy to ensure it meets your needs.

Please feel free to contact our local sales representatives or our customer service unit at 877-GET-PHLY, if you need further assistance.

As a free loss control benefit to our policyholders, Philadelphia Insurance Companies (PIC) has partnered with a nationally recognized law firm Wilson, Elser, Moskowitz, Edelman and Dicker LLP (WEMED), to offer a toll-free **Loss Assistance Hotline**.  The toll-free loss assistance hotline telephone number is **1-877-742-2201**.  You can also contact a WEMED attorney online at either of the following internet addresses: **http://www.wemed.com/pic/ or <http://www.losscontrol.com> .** This hotline provides policyholders 2 free hours of legal consultation with a knowledgeable attorney on any matter that could potentially result in a claim under your PIC policy.  This loss assistance hotline is **NOT** a loss reporting hotline.  To report a claim, read the claim reporting instructions in your Policy, or ask your agent.  If you have questions concerning the loss assistance hotline, please contact us at 1-800-759-4961 x2967.

The Philadelphia Insurance Companies thanks you for choosing us to meet your insurance needs.


Sincerely,


Philadelphia Insurance Companies



**PHILADELPHIA**
INSURANCE COMPANIES

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

## Philadelphia Indemnity Insurance Company
### COMMON POLICY DECLARATIONS

**Policy Number:** PHSD619786

**Named Insured and Mailing Address:**
Providence Community Action Program
ProCAP Housing Inc
518 Hartford Ave
Providence, RI 02909-5848

**Producer:** 3339
TROY, PIRES & ALLEN LLC
376 NEWPORT AVENUE
P.O. BOX 4830
EAST PROVIDENCE, RI 02916

**Policy Period From:** 06/08/2011  **To:** 06/08/2012     at 12:01 A.M. Standard Time at your mailing address shown above.

**Business Description:** Non-Profit Organization

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | PREMIUM |
|---|---|
| Commercial Property Coverage Part | |
| Commercial General Liability Coverage Part | |
| Commercial Crime Coverage Part | |
| Commercial Inland Marine Coverage Part | |
| Commercial Auto Coverage Part | |
| Businessowners | |
| Workers Compensation | |
| Flexi Plus Five | 2,038.00 |
| | |
| **Total** | **$   2,038.00** |

**FORM (S) AND ENDORSEMENT (S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE**
**Refer To Forms Schedule**

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

CPD- PIIC (01/07)

_____
Countersignature Date

_Christopher J Maguire_
Authorized Representative

Philadelphia Indemnity Insurance Company

Form Schedule – Policy

**Policy Number:** PHSD619786

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| BJP-190-1 | 1298 | Commercial Lines Policy Jacket |
| LAH-Notice | 1002 | Policyholder Notice (Loss Assistance Hotline) |
| CPD-PIIC | 0107 | Common Policy Declarations |
| PP 0701 | 0701 | Privacy Policy Notice |
| IL0985 | 0108 | Disclosure Pursuant to Terrorism Risk Ins Act of 2002 |

PI-NPD-1 (01-02)

 **PHILADELPHIA**
**INSURANCE COMPANIES**

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

**FLEXIPLUS FIVE**
NOT-FOR-PROFIT ORGANIZATION DIRECTORS & OFFICERS LIABILITY INSURANCE
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE
WORKPLACE VIOLENCE INSURANCE
INTERNET LIABILITY INSURANCE

[X] Philadelphia Indemnity Insurance Company          [ ] Philadelphia Insurance Company

Policy Number: PHSD619786

DECLARATIONS

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY
IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE
DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO
THE TERMS HEREIN.  THE AMOUNTS INCURRED FOR DEFENSE COST SHALL BE APPLIED
AGAINST THE RETENTION.**

Item    1.      Parent Organization and Address:
                Providence Community Action Program
                ProCAP Housing Inc
                518 Hartford Ave
                Providence, RI 02909-5848

                Internet Address: www. n/a

Item    2.      Policy Period:          From: 06/08/2011 To: 06/08/2012
                                        (12:01 A.M. local time at the address shown in Item 1.)

Item    3.      Limits of Liability:
                (A)     Part 1, D&O Liability:          $      1,000,000  each Policy Period.
                (B)     Part 2, Employment Practices:   $      1,000,000  each Policy Period.
                (C)     Part 3, Fiduciary Liability:    $                 each Policy Period.
                (D)     Part 4, Workplace Violence:     $                 each Policy Period.
                (E)     Part 5, Internet Liability:     $                 each Policy Period.
                (F)     Aggregate, All Parts:           $      1,000,000  each Policy Period.

PI-NPD-1 (01-02)

Item    4.    Retention:
            (A)    Part 1, D&O Liability:              $      10,000 for each Claim under Insuring
                                                                            Agreement B & C.
            (B)    Part 2, Employment Practices:  $      10,000 for each Claim.
            (C)    Part 3, Fiduciary Liability:        $              for each Claim.
            (D)    Part 4, Workplace Violence:     $              for each Workplace Violence Act.
            (E)    Part 5, Internet Liability:        $              for each Claim.


Item    5. Prior and Pending Date:         Part 1    06/08/2010    Part 2    06/08/2010    Part 3 No Date Applies
                                            Part 4 No Date Applies  Part 5 No Date Applies


Item    6.    Premium:              Part 1 $    1,858.00    Part 2 $        180.00    Part 3
                                    Part 4                  Part 5

                                                          Total Premium: $    2,038.00


Item    7.    Endorsements: PER SCHEDULE ATTACHED


In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized
officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.


_____          _____          _____
Authorized Representative          Countersignature                   Countersignature Date

Philadelphia Indemnity Insurance Company

Form Schedule – Flexi Plus Five

**Policy Number:** PHSD619786

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| PI-NPD-1 | 0102 | FlexiPlus Five Declarations Page |
| PI-BELL-1 | 1109 | Bell Endorsement |
| PI-CME-1 | 1009 | Crisis Management Enhancement Endorsement |
| PI-NPD-2 | 0102 | Flexi Plus Five Policy |
| PI-NPD-8 | 0102 | Shared Limits Endorsement |
| PI-NPD-25 | 0102 | Professional Services Exclusion(Supervision Carve-Out) |
| PI-NPD-27 | 0102 | Sexual Abuse Exclusion |
| PI-NPD-52 | 1203 | Amendment of Exclusions |
| PI-NPD-66 | 0604 | Employment Practices Liability Third Party |
| PI-NPD-82 | 0905 | Pro-Pak Elite Enhancement |
| PI-SLD-001 | 0108 | Cap on Losses from Certified Acts of Terrorism |

PP-0701 07-01

# PHILADELPHIA INSURANCE COMPANIES

## PRIVACY POLICY NOTICE

### Philadelphia Insurance Company & Philadelphia Indemnity Insurance Company

The Philadelphia Insurance Companies values your privacy and we are committed to protecting personal information that we collect during the course of our business relationship.

The collection, use and disclosure of certain nonpublic personal information are regulated by law.

This notice is for your information only and requires no action on your part. It will inform you about the types of information we collect and how it may be disclosed. This does not reflect a change in the way we do business or handle your information.

**Information We Collect:**

We collect personal information about you from the following sources:
* Applications or other forms such as claims forms or underwriting questionnaires completed by you;
* Information about your transactions with us, our affiliates or others; and
* Depending on the type of transaction you are conducting with us, information may be collected from consumer reporting agencies, health care providers, employers and other third parties.

**Information We Disclose:**

We will only disclose the information described above, as permitted by law, to our affiliates and non-affiliated third parties when necessary to conduct our normal business activities.

For example, we may make disclosures to the following types of third parties:
* Your agent or broker;
* Parties who perform a business, professional or insurance function for our company, including our reinsurance companies;
* Independent claims adjusters, investigators, other insurers, medical care institutions and attorneys who need the information to investigate, defend or settle a claim involving you;
* Insurance regulatory agencies in connection with the regulation of our business; and
* Lienholders, mortgagees, lessors or other persons shown on our records as having legal or beneficial interest in your policy.

We do not sell your information to others for marketing purposes.
We do not disclose the personal information of persons who have ceased to be our customers.

**Protection of Information:**

The Philadelphia Insurance Companies maintains physical, electronic and procedural safeguards that comply with state and federal regulations to protect the confidentiality of your personal information. We also limit employee access to personally identifiable information to those with a business reason for knowing such information.

**How to Contact Us:**

Feel free to call or write to us for additional information.

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
(877)-438-7459

POLICY NUMBER: PHSD619786

IL 09 85 01 08

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE

Terrorism Premium (Certified Acts) $ 0

This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(s):

Additional information, if any, concerning the terrorism premium:

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© ISO Properties, Inc., 2007

PI-BELL-1 (11/09)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## BELL ENDORSEMENT

 **PHILADELPHIA**
**INSURANCE COMPANIES**

*A Member of the Tokio Marine Group*

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

**I.    SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS**

The following is a summary of Limits of Liability or Limits of Insurance and/or additional coverages provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

| COVERAGE | LIMITS OF INSURANCE |
|---|---|
| Business Travel Accident Benefit | $50,000 |
| Conference Cancellation | $25,000 |
| Donation Assurance | $50,000 |
| Emergency Real Estate Consulting Fee | $50,000 |
| Fundraising Event Blackout | $25,000 |
| Identity Theft Expense | $50,000 |
| Image Restoration and Counseling | $50,000 |
| Key Individual Replacement Expenses | $50,000 |
| Kidnap Expense | $50,000 |
| Political Unrest | $5,000 per employee: $25,000 policy limit |
| Temporary Meeting Space Reimbursement | $25,000 |
| Terrorism Travel Reimbursement | $50,000 |
| Travel Delay Reimbursement | $1,500 |
| Workplace Violence Counseling | $50,000 |

© 2009 Philadelphia Insurance Companies

PI-BELL-1 (11/09)

## II. CONDITIONS

### A. Applicability of Coverage

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.

### B. Limits of Liability or Limits of Insurance

1. When coverage is provided by this endorsement and another coverage form or endorsement attached to this policy, the greater limits of liability or limits of insurance will apply.  In no instance will multiple limits apply to coverages which may be duplicated within this policy.  Additionally, if this policy and any other coverage part or policy issued to you by us, or any company affiliated with us, apply to the same occurrence, offense, wrongful act, accident or loss, the maximum limits of liability or limits of insurance under all such coverage parts or policies combined shall not exceed the highest applicable limits of liability or limits of insurance under any one coverage part or policy.

2. Limits of liability or limits of insurance identified in Section **I. SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS** above are not excess of, but are in addition to the applicable Limits of Liability or Limits of Insurance stated in the Declarations.

### C. Claim Expenses

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

## III. ADDITIONAL COVERAGES

### A. Business Travel Accident Benefit

We will pay a Business Travel Accident Benefit to the insured if a director or officer suffers injury or death while traveling on a common carrier for your business during the policy period.

For the purpose of Business Travel Accident Benefit coverage, injury means:

1. Physical damage to the body caused by violence, fracture, or an accident that results in loss of life not later than one hundred eighty (180) days after the policy expiration, the date of cancellation or the date of non-renewal;

2. Accidental loss of limbs or multiple fingers;

3. Total loss of sight, speech or hearing.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

The Business Travel Accident Benefit shall not be payable if the cause of the injury was:

1. An intentional act by the insured;

2. An act of suicide or attempted suicide;

3. An act of war; or

4. A disease process.

© 2009 Philadelphia Insurance Companies

PI-BELL-1 (11/09)

**B.  Conference Cancellation**

We will reimburse the insured for any business-related conference expenses, paid by the insured and not otherwise reimbursed, for a canceled conference that an employee was scheduled to attend.  The cancellation must be due directly to a "natural catastrophe" or a "communicable disease" outbreak that forces the cancellation of the conference.

With respect to a conference cancellation claim, it is further agreed as follows:

**1.**  The insured employee must have registered for the conference at least thirty (30) days prior to the cancellation; and

**2.**  The cancellation must be ordered by a local, state or federal Board of Health or other governmental authority having jurisdiction over the location of the conference.

The limit of insurance for this coverage is $25,000 per policy period for all insureds combined. No deductible applies to this coverage.

**C.  Donation Assurance**

If the insured is a 501(c)(3) status non-profit organization as defined in the United States Internal Revenue Code, we will reimburse the insured for "failed donation claim(s)."

With respect to any "failed donation claim," it is further agreed as follows:

**1.**  The donor must not have been in bankruptcy, nor have filed for bankruptcy or reorganization in the past seven (7) years prior to the time said pledge was made to the insured;

**2.**  For non-cash donations, our payment of a "failed donation claim" shall be based on the fair market value of said non-cash donation at the time of the "failed donation claim";

**3.**  In the case of unemployment or incapacitation of a natural person donor and as a condition of payment of the "failed donation claim":

**a.**  Neither the natural person donor nor the insured shall have had reason to believe the donor would become unemployed or incapacitated subsequent to the donation date; and

**b.**  The donor shall be unemployed for at least sixty (60) days prior to a claim being submitted by the insured;

**4.**  No coverage shall be afforded for a written pledge of funds or other measurable, tangible property to the insured dated prior to the policy period; and

**5.**  A donation amount which is to be collected by the insured over more than a twelve (12) month period shall be deemed a single donation.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

**D.  Emergency Real Estate Consulting Fee**

We will reimburse the insured any realtor's fee or real estate consultant's fee necessitated by the insured's need to relocate due to the "unforeseeable destruction" of the insured's "principal location" listed in the Declarations during the policy period.  The limit of insurance for this

PI-BELL-1 (11/09)

coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**E.  Fundraising Event Blackout**

We will reimburse the insured for "fundraising expenses" that are incurred due to the cancellation of a fundraising event caused by the lack of electric supply resulting in a power outage, provided the fundraising event is not re-scheduled.  The fundraising event must have been planned at least thirty (30) days prior to the power outage.  The limit of insurance for this coverage is $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**F.  Identity Theft Expense**

We will reimburse any present director or officer of the named insured for "identity theft expenses" incurred as the direct result of any "identity theft" first discovered and reported during the policy period; provided that it began to occur subsequent to the effective date of the insured's first policy with us.  The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**G.  Image Restoration and Counseling**

We will reimburse the insured for expenses incurred for image restoration and counseling arising out of "improper acts" by any natural person.

Covered expenses are limited to:

1.  The costs of rehabilitation and counseling for the accused natural person insured, provided the natural person insured is not ultimately found guilty of criminal conduct; this reimbursement to occur after acquittal of the natural person insured;

2.  The costs charged by a recruiter or expended on advertising, for replacing an officer as a result of "improper acts"; and

3.  The costs of restoring the named insured's reputation and consumer confidence through image consulting.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**H.  Key Individual Replacement Expenses**

We will pay "key individual replacement expenses" if the Chief Executive Officer or Executive Director suffers an "injury" during the policy period which results in the loss of life during the policy period.  The limit of insurance for this coverage is the lesser of $50,000 or ten (10) times the annual premium paid for this policy.  No deductible applies to this coverage.

**I.  Kidnap Expense**

We will pay on behalf of any director or officer of the insured, reasonable fees incurred as a result of the kidnapping of them or their spouse, "domestic partner," parent or child during the policy period.  Coverage will not apply to any kidnapping by or at the direction of any present or former family member of the victim.

Reasonable fees will include:

© 2009 Philadelphia Insurance Companies

PI-BELL-1 (11/09)

1.  Fees and costs of independent negotiators;

2.  Interest costs for any loan from a financial institution taken by you to pay a ransom demand or extortion threat;

3.  Travel costs and accommodations incurred by the named insured;

4.  Reward money paid to an informant which leads to the arrest and conviction of parties responsible for loss covered under this insurance; and

5.  Salary, commissions and other financial benefits paid by you to a director or officer. Such compensation applies at the level in effect on the date of the kidnap and ends upon the earliest of:

    a.  Up to thirty (30) days after their release, if the director or officer has not yet returned to work;

    b.  Discovery of their death;

    c.  One hundred twenty (120) days after the last credible evidence following abduction that they are still alive; or

    d.  Twelve (12) months after the date of the kidnapping.

The limit of insurance for this coverage is $50,000 each policy period for all insureds combined. No deductible applies to this coverage.

**J.  Political Unrest Coverage**

We will reimburse any present director, officer, employee or volunteer of the named insured while traveling outside the United States of America for "emergency evacuation expenses" that are incurred as a result of an incident of "political unrest." This "political unrest" must occur during the policy period. No coverage is granted for travel to countries in a state of "political unrest" at the time of departure of the travel. The limit of insurance for this coverage is $5,000 per covered person, subject to a maximum of $25,000 per policy period for all insureds combined. No deductible applies to this coverage.

**K.  Temporary Meeting Space Reimbursement**

We will reimburse the insured for rental of meeting space which is necessitated by the temporary unavailability of the insured's primary office space due to the failure of a climate control system, or leakage of a hot water heater during the policy period. Coverage will exist only for the renting of temporary meeting space required for meeting with parties who are not insured under this policy. The limit of insurance for this coverage is $25,000 per policy period for all insureds combined. No deductible applies to this coverage.

**L.  Terrorism Travel Reimbursement**

We will reimburse any present director or officer of the named insured in the event of a "certified act of terrorism" during the policy period which necessitates that he/she incurs "emergency travel expenses." The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

© 2009 Philadelphia Insurance Companies

**M.  Travel Delay Reimbursement**

We will reimburse any present director or officer of the named insured for any "non-reimbursable expenses" they incur as a result of the cancellation of any regularly scheduled business travel on a common carrier.  The limit of insurance for this coverage is $1,500 per policy period for all insureds combined.  A seventy-two (72) hour waiting period deductible applies to this coverage.

**N.  Workplace Violence Counseling**

We will reimburse the insured for emotional counseling expenses incurred directly as a result of a "workplace violence" incident at any of the insured's premises during the policy period.  The emotional counseling expenses incurred must have been for:

**1.**  Your employees who were victims of, or witnesses to the "workplace violence";

**2.**  The spouse, "domestic partner," parents or children of your employees who were victims of, or witnesses to the "workplace violence"; and

**3.**  Any other person or persons who directly witnessed the "workplace violence" incident.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

**IV.  DEFINITIONS**

For the purpose of this endorsement, the following definitions apply:

**A.**  "Certified act of terrorism" means any act so defined under the Terrorism Risk Insurance Act, and its amendments or extensions.

**B.**  "Communicable disease" means an illness, sickness, condition or an interruption or disorder of body functions, systems or organs that is transmissible by an infection or a contagion directly or indirectly through human contact, or contact with human fluids, waste, or similar agent, such as, but not limited to Meningitis, Measles or Legionnaire's Disease.

**C.**  "Domestic partner" means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the named insured.

**D.**  "Emergency evacuation expenses" mean:

**1.**  Additional lodging expenses;

**2.**  Additional transportation costs;

**3.**  The cost of obtaining replacements of lost or stolen travel documents necessary for evacuation from the area of "political unrest"; and

**4.**  Translation services, message transmittals and other communication expenses.

provided that these expenses are not otherwise reimbursable.

**E.**  "Emergency travel expenses" mean:

1. Hotel expenses incurred which directly result from the cancellation of a scheduled transport by a commercial transportation carrier, resulting directly from and within forty-eight (48) hours of a "certified act of terrorism"; and

2. The increased amount incurred which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to a "certified act of terrorism";

provided that these expenses are not otherwise reimbursable.

F. "Failed donation claim" means written notice to the insured during the policy period of:

1. The bankruptcy or reorganization of any donor whereby such bankruptcy or reorganization prevents the donor from honoring a prior written pledge of funds or other measurable, tangible property to the insured; or

2. The unemployment or incapacitation of a natural person donor preventing him/her from honoring a prior written pledge of funds or other measurable, tangible property to the insured.

G. "Fundraising expenses" mean deposits forfeited and other charges paid by you for catering services, property and equipment rentals and related transport, venue rentals, accommodations (including travel), and entertainment expenses less any deposits or other fees refunded or refundable to you.

H. "Identity theft" means the act of knowingly transferring or using, without lawful authority, a means of identification of any director or officer (or spouse or "domestic partner" thereof) of the named insured with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

I. "Identity theft expenses" mean:

1. Costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies;

2. Costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors; and

3. Loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information.

J. "Improper acts" means any actual or alleged act of:

1. Sexual abuse;

2. Sexual intimacy;

3. Sexual molestation; or

4. Sexual assault;

committed by an insured against any natural person who is not an insured.  Such "improper acts" must have been committed by the insured while in his or her capacity as an insured.

K. "Injury" whenever used in this endorsement, other than in Section **III. A. Business Travel**,

PI-BELL-1 (11/09)

means any physical damage to the body caused by violence, fracture or an accident.

**L.** "Key individual replacement expenses" mean the following necessary expenses:

    **1.** Costs of advertising the employment position opening;

    **2.** Travel, lodging, meal and entertainment expenses incurred in interviewing job applicants for the employment position opening; and

    **3.** Miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up an employment contract.

**M.** "Natural catastrophe" means hurricane, tornado, earthquake or flood.

**N.** "Non-reimbursable expenses" means the following travel-related expenses incurred after a seventy-two (72) hour waiting period, beginning from the time documented on the proof of cancellation, and for which your director or officer produces a receipt:

    **1.** Meals and lodging;

    **2.** Alternative transportation;

    **3.** Clothing and necessary toiletries; and

    **4.** Emergency prescription and non-prescription drug expenses.

**O.** "Political unrest" means:

    **1.** A short-term condition of disturbance, turmoil or agitation within a foreign country that poses imminent risks to the security of citizens of the United States;

    **2.** A long-term condition of disturbance, turmoil or agitation that makes a foreign country dangerous or unstable for citizens of the United States; or

    **3.** A condition of disturbance, turmoil or agitation in a foreign country that constrains the United States Government's ability to assist citizens of the United States, due to the closure or inaccessibility of an embassy or consulate or because of a reduction of its staff

for which either an alert or travel warning has been issued by the United States Department of State.

**P.** "Principal location" means the headquarters, home office or main location where most business is substantially conducted.

**Q.** "Unforeseeable destruction" means damage resulting from a "certified act of terrorism," fire, collision or collapse which renders all of the insured's "principal locations" completely unusable.

**R.** "Workplace violence" means any intentional use of or threat to use deadly force by any person with intent to cause harm and that results in bodily "injury" or death of any person while on the insured's premises.

© 2009 Philadelphia Insurance Companies

PI-CME-1 (10/09)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CRISIS MANAGEMENT ENHANCEMENT ENDORSEMENT

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

Solely for the purpose of this endorsement:  1) The words  "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.  2) The words "we," "us" and "our" refer to the company providing this insurance.

**I.      SCHEDULE OF ADDITIONAL COVERAGE AND LIMITS**

The following is the Limit of Liability provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

Crisis Management Expense                                                                    $25,000

**II.     CONDITIONS**

**A.  Applicability of Coverage**

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.  All other terms and conditions of the policy or coverage part to which this endorsement is attached remain unchanged.

**B.  Limits of Liability or Limits of Insurance**

When coverage is provided by this endorsement and any other coverage form or endorsement attached to this policy, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Liability or Limit of Insurance.

**C.  Claim Expenses**

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

**III.    ADDITIONAL COVERAGES**

**A.**  We will reimburse you for "crisis management emergency response expenses" incurred because of an "incident" giving rise to a "crisis" to which this insurance applies.  The amount of such reimbursement is limited as described in Section **II. CONDITIONS, B. Limits of Liability or Limits of Insurance**.  No other obligation or liability to pay sums or perform acts or services is covered.

**B.**  We will reimburse only those "crisis management emergency response expenses" which are incurred during the policy period as shown in the Declarations of the policy to which this coverage is attached and reported to us within six (6) months of the date the "crisis" was initiated.

PI-CME-1 (10/09)

## IV. DEFINITIONS

**A.** "Crisis" means the public announcement that an "incident" occurred on your premises or at an event sponsored by you.

**B.** "Crisis management emergency response expenses" mean those expenses incurred for services provided by a "crisis management firm." However, "crisis management emergency response expenses" shall not include compensation, fees, benefits, overhead, charges or expenses of any insured or any of your employees, nor shall "crisis management emergency response expenses" include any expenses that are payable on your behalf or reimbursable to you under any other valid and collectible insurance.

**C.** "Crisis management firm" means any service provider you hire that is acceptable to us. Our consent will not be unreasonably withheld.

**D.** "Incident" means an accident or other event, including the accidental discharge of pollutants, resulting in death or serious bodily injury to three or more persons.

**E.** "Serious bodily injury" means any injury to a person that creates a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

PI-NPD-2 (01/02)

# *FLEXI PLUS FIVE*

NOT-FOR-PROFIT ORGANIZATION DIRECTORS & OFFICERS LIABILITY INSURANCE
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE
WORKPLACE VIOLENCE INSURANCE
INTERNET LIABILITY INSURANCE

**EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS IS A CLAIMS MADE POLICY.**

**CLAIMS MADE POLICIES ONLY COVER THOSE CLAIMS MADE AGAINST THE INSURED DURING THE POLICY PERIOD.**

In consideration of the premium paid and in reliance upon all statements made and information furnished to the **Underwriter,** including all statements made in the **Application,** the **Underwriter** agrees to provide coverage as shown in the Declarations and described as follows:

## Part 1
### Not-for-Profit Organization Directors & Officers Liability Insurance
(To be read in conjunction with the Common Policy
Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I. INSURING AGREEMENTS

    A. The **Underwriter** will pay on behalf of the **Individual Insured, Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts,** except to the extent the **Organization** has indemnified the **Individual Insureds** for such **Loss.**

    B. The **Underwriter** will pay on behalf of the **Organization, Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts,** if the **Organization** has indemnified such **Individual Insureds** for such **Loss.**

    C. The **Underwriter** will pay on behalf of the **Organization, Loss** from **Claims** made against the **Organization** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **D&O Wrongful Act.**

II. DEFINITIONS

    A. **D&O Wrongful Act** means any actual or alleged:

        1. act, error, omission, misstatement, misleading statement, neglect, breach of duty or **Personal & Advertising Injury** committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured;** or by the **Organization;** or

        2. act, error, omission, misstatement, misleading statement, neglect, breach of duty or **Personal & Advertising Injury** committed or attempted by an **Individual Insured** while serving as a director, officer, governor or trustee of any **Outside Entity,** if such service is at the written request or direction of the **Organization.**

    However, **D&O Wrongful Act** does not include an **Employment Practice Act, Fiduciary Liability Act,** or **Internet Liability Act.**

    B. **Outside Entity** means:

        1. any not-for-profit entity described in section 501(c) of the Internal Revenue Code of 1986 (as amended); or

        2. any other entity listed as an **Outside Entity** in an endorsement to this Policy.

    C. **Personal & Advertising Injury** means any actual or alleged:

        1. false arrest, detention or imprisonment, or malicious prosecution; or

2.  oral or written publication of material that slanders or libels a person or entity or disparages a person's or entity's goods, products or services; or
3.  oral or written publication of material that violates a person's right of privacy; or
4.  wrongful eviction or entry or other invasion of the right of privacy; or
5.  misappropriation of advertising ideas, unauthorized use of title or slogan, or plagiarism; or
6.  infringement of copyright or trademark.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 1 to make any payment for **Loss** in connection with any **Claim** made against an **Insured:**

A. arising out of, based upon or attributable to any actual or alleged infringement of any patent or misappropriation of trade secrets;

B. arising out of, based upon or attributable to any actual or alleged:
   1.  publication or utterance of material by or at the direction of such **Insured** with knowledge of its falsity; or
   2.  composing, editing, designing, publishing, distributing or printing periodicals, advertisements or other materials by the **Insured** for another party if such activity is not in connection with and not a regular part of the **Insured's** own publications; or
   3.  failure of goods, products or services to conform with advertised quality or performance; or
   4.  wrong description of the price of goods, products or services;

C. arising out of, based upon or attributable to any actual or alleged breach of contract or agreement. However, this exclusion shall not apply to the following:
   1.  liability of the **Insured** which would have attached even in the absence of such contract or agreement; or
   2.  Defense Cost.

IV. PRESUMPTIVE INDEMNIFICATION

If the **Organization** is permitted or required by common or statutory law, but fails to indemnify the **Insured** for **Loss** (except by reason of its financial insolvency), any payment by the **Underwriter** of such **Loss** shall be subject to the Insuring Agreement C Retention amount set forth in Item 4(A) of the Declarations Page. The charter, by-laws, shareholder and board of director's resolutions of the **Organization** shall be deemed to provide indemnification for such **Loss** to the fullest extent permitted by law.

## Part 2
### Employment Practices Liability Insurance
(To be read in conjunction with the Common Policy
Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.  INSURING AGREEMENTS

A. The **Underwriter** will pay on behalf of the **Insured, Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Employment Practices Act.**

II.  DEFINITIONS

A. **Employment Practice Act** means any actual or alleged:
   1.  wrongful dismissal, discharge or termination of employment;
   2.  breach of a written or oral employment contract or implied employment contract;

PI-NPD-2 (01/02)

3.   employment related misrepresentation;

4.   wrongful failure to promote;

5.   violation of employment discrimination laws (including harassment);

6.   wrongful deprivation of a career opportunity;

7.   employment related wrongful discipline;

8.   negligent employee evaluation;

9.   employment related invasion of privacy;

10.  employment related defamation (including libel and slander);

11.  sexual or workplace harassment of any kind;

12.  constructive discharge of employment;

13.  employment related retaliation;

14.  employment related humiliation;

15.  wrongful demotion;

16.  negligent reassignment;

17.  violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Organization.**

Solely with respect to any **Claim** brought by or on behalf of any **Third Party, Employment Practices Act** means any actual or alleged wrongful failure to employ, discrimination, sexual harassment or violation of such **Third Party's** civil rights in relation to such wrongful failure to employ, discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Organization.**

However, **Employment Practices Act** does not include a **D&O Wrongful Act, Fiduciary Liability Act,** or **Internet Liability Act.**

B. **Third Party** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Organization.**

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 2 to make any payment for **Loss** in connection with any **Claim** made against the **Insured:**

A. arising out of, based upon or attributable to any failure to comply with any law concerning Workers Compensation, Unemployment Insurance, Social Security, Disability Benefits or any similar laws; however, this exclusion shall not apply to any **Claim** for retaliatory treatment against any **Individual Insured** who is attempting to exercise his/her rights under the above laws;

B. arising out of, based upon or attributable to any violation of any of the responsibilities, obligations, or duties imposed by the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act (except the Equal Pay Act), Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law; however, this exclusion shall not apply to any **Claim** for retaliatory treatment against any **Individual Insured** who is attempting to exercise his/her rights under the above statute, law, rule, regulation or order;

C. arising out of, based upon or attributable to a lockout, strike, picket line, replacement or other similar action resulting from labor disputes, labor negotiations, or collective bargaining agreements;

D. arising out of, based upon or attributable to obligations or payments owed under (i) an express (written or verbal) contract of employment, (ii) an agreement to make payments in the event of the termination of employment, or (iii) an agreement to assume another's liability; however, this

exclusion does not apply to any of the following:

1. liability of the **Organization** which would have attached even in the absence of such contract or agreement; or
2. Defense Costs.

E. to the extent such **Loss** constitutes employment-related benefits, stock options, perquisites, deferred compensation or any other type of compensation earned by the claimant in the course of employment or the equivalent value thereof; however, this exclusion shall not apply to front pay or back pay.

## Part 3
## Fiduciary Liability Insurance
(To be read in conjunction with the Common Policy
Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I. INSURING AGREEMENTS

A. The **Underwriter** will pay on behalf of the **Insured, Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act.**

II. DEFINITIONS

A. **Administration** means: (i) giving counsel to employees, beneficiaries or participants regarding any **Benefit Plan,** (ii) providing interpretations and handling records in connection with any **Benefit Plan,** or (iii) effecting enrollment, termination or cancellation of employees or participants under any **Benefit Plan.**

B. **Benefit Plan** means:

1. any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Organization** solely for the benefit of the employees of the **Organization;**
2. any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Organization** solely for the benefit of the employees of the **Organization,** provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application;**
3. any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the employees of the **Organization,** but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan,** and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion;
4. any government-mandated benefit program for workers compensation, unemployment, social security or disability benefit for employees of the **Organization.**

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan.**

However, **Benefit Plan** does not include any multi-employer plan.

C. **Fiduciary Liability Act** means any actual or alleged:

1. breach by an **Insured** of the responsibilities, obligations or duties imposed upon fiduciaries of any **Benefit Plan** by **ERISA;** or
2. negligent act, error or omission by an **Insured** solely in the **Administration** of any **Benefit**

PI-NPD-2 (01/02)

**Plans.**

However, **Fiduciary Liability Act** does not include a **D&O Wrongful Act** or an **Internet Liability Act.**

D. **Pension Benefit Plan** means any employee pension benefit plan, as defined in **ERISA.**

E. **Welfare Benefit Plan** means any employee welfare benefit plan, as defined in **ERISA.**

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 3 to make any payment for **Loss** in connection with any **Claim** made against the **Insured:**

A.   arising out of, based upon or attributable to the actual or alleged failure to collect or fund contributions owed to any **Benefit Plan;** or for the return or reversion to any employer of any contribution to or asset of a **Benefit Plan;**

B.   to the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable law; however, this exclusion shall not apply to **Defense Costs;**

C.   arising out of, based upon or attributable to any failure or omission to effect and maintain insurance or bonding for the property or assets of any **Benefit Plan;**

D.   arising out of, based upon or attributable to any liability of others assumed by the **Insured** under any contract or agreement, other than any contract or agreement establishing a **Benefit Plan.**

### Part 4

### Workplace Violence Insurance

(To be read in conjunction with the Common Policy
Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.   INSURING AGREEMENTS

A. The **Underwriter** will pay on behalf of the **Organization** any **Violence Damage,** resulting from a **Workplace Violence Act** occurring during the **Policy Period** and reported to the **Underwriter** pursuant to the terms of this Policy.

II.   DEFINITIONS

A. **Violence Damage** means:

1. **Business Interruption Expense**
2. **Public Image Restoration Expense**
3. **Workplace Violence Expense**

B. **Business Interruption Expense** means the amount calculated as set forth below for a period of time commencing on the day the **Workplace Violence Act** occurs until the earlier of ninety (90) days following such date, or until the **Organization** restores operations with due diligence and dispatch to the level that existed prior to the **Workplace Violence Act:**

1. The sum of:

a.   net profits before income taxes that would have been earned had no **Workplace Violence Act** occurred; and

b.   the actual cost of continuing the activities which are necessary for the **Organization** to resume operations with substantially the same quality of service which existed immediately preceding the **Workplace Violence Act;** and

c.   reasonable expenses which would not have been incurred except for such **Workplace Violence Act** and which were incurred by the **Organization** for the sole purpose of

reducing **Business Interruption Expense** described in B.1. (a or b) above, not to exceed the amount of actual reduction of such **Business Interruption Expense; and**

2. Less the sum of:
    a. all recoveries, other insurance, suretyship and other indemnity which cover **Business Interruption Expense** described in B.1. above; and
    b. the amount by which the **Organization** reasonably could have but fails to reduce **Business Interruption Expense** described in B.1. above.

C. **Public Image Restoration Expense** means reasonable fees and expenses for, or cost of:
    1. an independent public relations consultant for up to ninety (90) days following the date the **Workplace Violence Act** occurs;
    2. an independent security consultant for up to ninety (90) days following the date the **Workplace Violence Act** occurs;
    3. a counseling seminar for **Individual Insureds** conducted by an independent consultant following the **Workplace Violence Act;**
    4. independent security guard service for up to thirty (30) days following the date the **Workplace Violence Act** occurs;
    5. an independent forensic analyst for up to ninety (90) days following the date the **Workplace Violence Act** occurs;

D. **Workplace Violence Expense** means the reasonable fees and expenses for, or cost of:
    1. the **Salary** or **Wages,** for up to ninety (90) days following the date the **Workplace Violence Act** occurs, that the **Organization** pays **Individual Insureds** victimized by **Workplace Violence Acts** and unable to continue to work because of such **Workplace Violence Acts.** The **Salary** or **Wages** in effect at the time of the **Workplace Violence Act** shall apply;

    2. the **Salary** or **Wage,** for up to ninety (90) days following the date the **Workplace Violence Act** occurs, that the **Organization** pays a newly hired person(s) to conduct the duties of **Individual Insureds** victimized by **Workplace Violence Acts** and who is/are unable to continue to work because of such **Workplace Violence Acts;** however such **Salary** or **Wage** shall not exceed the **Salary** or **Wage** of the victimized **Individual Insured** in effect at the time of the **Workplace Violence Act.**

E. **Workplace Violence Act** means any actual or alleged intentional and unlawful use of, or threat to use, deadly force with an intent to cause harm at the **Premises.**

F. **Premises** means any building, facility or property occupied by the **Organization** in conducting its operations.

G. **Salary or Wage** means compensation the **Organization** pays an **Individual Insured,** including but not limited to bonus, commission, incentive payments, and the cost of health, welfare and pension benefits.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 4 to make any payment for **Violence Damage:**

A. arising out of, based upon or attributable to war, invasion, insurrection, riot, rebellion, revolution, civil war, or military action;

B. arising out of, based upon or attributable to a **Workplace Violence Act** which occurs at any location other than the **Premises;**

C. arising out of, based upon or attributable to the use or threat of force or violence occurring on the **Premises** for the purpose of demanding money, securities or property;

D. arising out of, based upon or attributable to a **Workplace Violence Act** occurring prior to the Prior and Pending Date shown in Item 5 of the Declarations Page.

PI-NPD-2 (01/02)

**Part 5**

Internet Liability Insurance

(To be read in conjunction with the Common Policy
Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I. INSURING AGREEMENTS

    A. The **Underwriter** will pay on behalf of the **Organization, Loss** from **Claims** made against the **Organization** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Internet Liability Act.**

II. DEFINITIONS

    A. **Internet Activity** means any display, transmission, dissemination, or other use of **Matter** on an **Internet Site.**

    B. **Internet Site** means the internet address(es) shown in Item 1 of the Declarations Page.

    C. **Matter** means printed, verbal, numerical, audio or visual expression, or any other expression, regardless of the medium upon which such expression is fixed.

    D. **Product** means any tangible property offered for sale or otherwise disseminated by or through any **Insured.**

    E. **Internet Liability Act** means any actual or alleged act, error, or omission committed or attempted by an **Insured** in their capacity as an **Insured** solely in connection with **Internet Activity** by or on behalf of the **Organization,** including:

        1. libel, slander, or oral or written publication of defamatory or disparaging material; or

        2. invasion of or interference with the right of privacy; or

        3. infringement of copyright, service mark, trademark, trade dress or trade name or title or slogan or improper use of literary or artistic titles, formats or performances.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 5 to make any payment for **Loss** in connection with any **Claim** made against the **Insured:**

    A. arising out of, based upon or attributable to any actual or alleged price fixing, restraint of trade, monopolization, unfair trade practices or any violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, and any amendments thereto; or any rules and regulations promulgated thereunder or in connection with such statutes; or any similar provision of any federal, state, or local statutory law or common law anywhere in the world;

    B. arising out of, based upon or attributable to any actual or alleged breach of contract or agreement, or for liability assumed by the **Organization** under a contract or agreement; however, this exclusion shall not apply to any of the following:

        1. liability of the **Organization** which would have attached even in the absence of such contract or agreement;

        2. **Defense Cost;**

    C. arising out of, based upon or attributable to any actual or alleged:

        1. wrong description of the price or authenticity of a **Product;** or

        2. failure of any **Product** to conform with advertised quality or performance; or

        3. sale or offer for sale of any **Product** that infringes upon the name, design or logo of another entity's **Product;**

    D. arising out of, based upon or attributable to any actual or alleged infringement of any patent or

PI-NPD-2 (01/02)

misappropriation of trade secrets;

E. to the extent such **Loss** constitutes amounts charged to or due from clients or customers of the **Organization,** or the value of any electronic fund transfer or transaction by or on behalf of the **Organization** which is lost or damaged during transfer into, from or between **Organization** accounts;

F. brought or maintained by or on behalf of any federal, state, or local regulatory agency or other administrative body alleging the violation of any federal, state or local laws or regulations;

G. arising out of, based upon or attributable to the development, distribution, dissemination, installation, implementation, operation, maintenance and/or filtering software, or of policies, equipment or procedures for establishing or managing a secure method for exchanging electronic information;

H. arising out of, based upon or attributable to any costs, expenses or other payment incurred by the **Insured** or others in connection with the withdrawal or recall from the marketplace of the **Insured's Products,** including other products which incorporated the **Insured's Products;**

I. arising out of, based upon or attributable to coupons, price discounts, prizes, awards, or any other valuable consideration given in excess of the total contracted or expected amount;

J. arising out of, based upon or attributable to (i) a computer virus, (ii) the unauthorized access to or use of a computer, computer system or computer network, or (iii) the inability of an authorized third party to access services provided by the **Organization** through the **Internet Site.**

## Part 6
## Common Policy Definitions

A. **Application** means:
1. the **Application** for this Policy, including any material submitted therewith; and
2. the **Application(s),** including any material submitted therewith, for all previous policies issued by the **Underwriter** of which this Policy is a direct or indirect renewal or replacement,

all of which shall be deemed a part of this Policy as if physically attached hereto.

B. **Claim** means for the purposes of Parts 1, 2, 3, and 5:
1. any written demand for monetary or non-monetary relief; or
2. any judicial, civil, administrative, regulatory, or arbitration proceeding (including any appeal there from), which subjects an **Insured** to a binding adjudication of liability for monetary or non-monetary relief for a **Wrongful Act;** or
3. any written request to toll or waive any statute of limitations applicable to any actual or potential suit or cause of action against an **Insured.**

However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

C. **Damage** means a monetary judgement, award or settlement including punitive, exemplary or multiple portion thereof, or, with respect to Part 4 (Workplace Violence Insurance), **Violence Damage.**

D. **Defense Cost** means:
1. any reasonable and necessary legal fees and expenses incurred in the defense of a **Claim,** whether by the **Insured** with the **Underwriter's** consent or directly by the **Underwriter,** in the investigation, adjustment, defense and appeal of a **Claim,** except that **Defense Cost** shall not include:
   a. any amounts incurred in defense of any **Claim** for which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty; or
   b. salaries, wages, overhead or benefit expenses associated with any **Insured** except as specified in subparagraph 2 below; or

PI-NPD-2 (01/02)

    c. salaries, wages, overhead or benefit expenses associated with employees of the **Underwriter.**

    2. a $250 per day per **Individual Insured** supplemental payment for the attendance at the request or with the consent of the **Underwriter** by such **Individual Insured** at hearings, trials or depositions. Such payment shall not exceed $5000 in the aggregate for all **Individual Insureds** in each **Claim.**

E. **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, any similar federal, state, local or common law, and any rules and regulations promulgated thereunder.

F. **Individual Insured** means:

    1. any individual who has been, now is or shall become a director, officer, governor, trustee, equivalent executive, employee (whether salaried or not), volunteer, leased or temporary employee, or committee member of the **Organization** or, solely with respect to Part 3 (Fiduciary Liability Insurance), of any **Benefit Plan;**

    2. the lawful spouse of a director, officer, governor, trustee, or equivalent executive of the **Organization,** but only for actual or alleged **Wrongful Acts** of such executive for which such spouse may be liable as the spouse of such executive;

    3. the estate, heirs, legal representatives or assigns of a deceased director or officer, or the legal representatives or assigns of such a person who is incompetent, but only for **Wrongful Acts** of the person described in (1) above which, in the absence of such death or incompetence, would have been covered by this Policy;

    4. with respect to an **Organization** chartered outside the United States of America, any individual who has been, now is or shall become a person serving in a position with such **Organization** that is equivalent to any position described in (1) above.

G. **Insured** means the **Organization** and **Individual Insured.**

H. **Interrelated Wrongful Act** means: any causally connected **Wrongful Act** or any series of the same, similar or related **Wrongful Acts.**

I. **Loss** means:

    1. **Damages;**

    2. **Defense Cost;**

    but **Loss** does not include:

    1. criminal or civil fines or penalties imposed by law except that solely with respect to Part 3 (Fiduciary Liability Insurance) **Loss** includes fines or penalties imposed under Section 502 (i) and (l) of **ERISA;** or

    2. taxes; or

    3. matters deemed uninsurable under the law to which this Policy shall be construed; or

    4. any amounts other than **Defense Cost,** which an **Insured** is obligated to pay as a result of a **Claim** seeking relief or redress in any form other than monetary damages; or

any costs other than **Defense Cost** associated with any accommodation required pursuant to the American With Disabilities Act, the Civil Rights Act of 1964, rules or regulations promulgated thereunder, amendments thereto, or similar provisions of any federal, state or local law or common law.

J. **Organization** means:

    1. the **Parent Organization,**

    2. any **Subsidiary,** and

    3. solely with respect to Part 3 (Fiduciary Liability Insurance), any **Benefit Plan.**

K. **Parent Organization** means the first entity named in Item 1 of the Declarations Page.

L. **Policy Period** means the period of time specified in Item 2 of the Declarations Page.

PI-NPD-2 (01/02)

M. **Subsidiary** means:

1. any not-for-profit entity for which, on or before the inception of the **Policy Period,** the **Parent Organization** has the right to elect or select a majority of the directors or trustees, provided such entity is identified as a **Subsidiary** in the **Application;**

2. any not-for-profit entity for which, after the inception of the **Policy Period,** the **Parent Organization** has the right to elect or select a majority of the directors or trustees, and whose assets total less than 35% of the total consolidated assets of the **Parent Organization** as of the inception date of this **Policy Period.** The **Parent Organization** shall provide the **Underwriter** with full particulars of the new **Subsidiary** before the end of the **Policy Period;**

3. any not-for-profit entity for which, after the inception of the **Policy Period,** the **Parent Organization** has the right to elect or select a majority of the directors or trustees, and whose assets total 35% or more of the total consolidated assets of the **Parent Organization** as of the inception date of this **Policy Period;** but only upon the condition that before the end of the **Policy Period** or within 90 days from having the right to elect or select a majority of the directors or trustees, whichever is lesser, the **Parent Organization** shall have provided the **Underwriter** with full particulars and agreed to any additional premium and/or amendment of the provisions of this Policy;

4. any for profit entity or the directors, officers, or trustees of a for profit entity for which, the **Underwriter,** at its sole discretion, agrees by written endorsement to provide coverage upon such terms or additional premium charged.

Further, coverage as shall be afforded by paragraphs 3 and 4 above is conditioned upon the **Parent Organization** paying when due any applicable additional premium required by the **Underwriter** relating to such new **Subsidiary.**

N. **Underwriter** means the stock insurance company check marked on the Declarations Page of this Policy.

O. **Wrongful Act** means:

1. with respect to Part 1, any **D&O Wrongful Act,**
2. with respect to Part 2, any **Employment Practices Act,**
3. with respect to Part 3, any **Fiduciary Liability Act,**
4. with respect to Part 5, any **Internet Liability Act**

## Part 7

### Common Policy Exclusions

The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured:**

A. arising out of, based upon or attributable to such **Insured** gaining any profit, remuneration or advantage to which they were not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission.

B. arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such **Insured;** however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission. This exclusion shall not apply to a **Workplace Violence Act** under Part 4 (Workplace Violence Insurance);

No **Wrongful Act** of any **Insured** shall be imputed to any **Individual Insured** for purpose of determining the applicability of Exclusions A and B above.

C. arising out of, based upon or attributable to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other

irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, or any cost or expense arising out of any governmental direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutants;

D. arising out of, based upon or attributable to any bodily injury or property damage regarding tobacco smoke, asbestos or mold including, without limitation, the use, exposure, presence, existence, detection, removal, elimination or avoidance of tobacco smoke, asbestos or mold to any persons and in any environment, building or structure;

E. arising out of, based upon or attributable to the radioactive, toxic, or explosive properties of nuclear material which includes, but is not limited to, Source Material, Special Nuclear Material and ByProduct Material as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto and any similar provisions of any federal, state or local statutory or common law;

F. arising out of, based upon or attributable to:

1. any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

2. any **Wrongful Act,** fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance prior to inception of this Policy; or

3. any **Wrongful Act,** fact, circumstance or situation of which, as of the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, the **Insured** had knowledge and from which the **Insured** could reasonably expect a **Claim** to arise.

G. arising out of, based upon or attributable to the insolvency, conservatorship, receivership, bankruptcy or liquidation of any bank, banking firm, broker, dealer, investment company, investment banker, insurance company, or other entity of a similar nature; or the failure to pay or suspension of payment by any such entity;

H. to the extent such **Loss** constitutes **Defense Costs** in a **Claim** directly or indirectly by, on behalf of, or for the benefit of any insurance carrier or bond carrier of the **Insured** or any affiliate of the **Insured,** regardless in whose name such **Claim** is actually made;

I. for any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property including **Loss** of use thereof; however, this exclusion shall not apply to Part 4 (Workplace Violence Insurance) or to mental anguish or emotional distress under Part 2 (Employment Practices Liability Insurance);

J. brought or maintained by, at the behest, or on behalf of the **Organization;**

K. for any actual or alleged violation of the responsibilities, obligations or duties imposed by **ERISA;** however, this exclusion shall not apply to Part 3 (Fiduciary Liability Insurance);

L. for a **Wrongful Act** committed or attempted by a **Subsidiary, Benefit Plan** or an **Individual Insured** of a **Subsidiary** or **Benefit Plan** before such entity or plan became an **Insured** or after the entity or plan ceased to be an **Insured;**

M. for service by the **Individual Insured** in any position or capacity in any entity other than the **Organization, a Benefit Plan** or an **Outside Entity,** even if the **Organization** directed or requested the **Individual Insured** to serve in such other position or capacity.

### Part 8

### Common Policy Conditions

I. LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made or **Workplace Violence Acts** committed, the **Underwriter's** liability under the Policy is limited as follows:

PI-NPD-2 (01/02)

A. With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Damages** on account of all **Claims** made during the **Policy Period,** whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3(A) of the Declarations.

B. With respect to coverage under Part 2, Part 3, Part 4, or Part 5 of this Policy, the **Underwriter's** maximum aggregate liability for all **Damages** on account of all **Claims** made, and all **Workplace Violence Acts** taking place, during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3(B), 3(C), 3(D) or 3(E), respectively, of the Declarations.

C. The **Underwriter's** maximum aggregate liability for all **Damage** on account of all **Claims** first made, and all **Workplace Violence Act**s taking place, during the **Policy Period** under all purchased Parts, combined, shall be the Aggregate Limit of Liability set forth in Item 3(F) of the Declarations. The Limits of Liability set forth in Item 3(A), 3(B), 3(C), 3(D) and 3(E) are sub-limits which do not increase the **Underwriter's** maximum liability as set forth in Item 3(F).

D. **Defense Cost** is in addition to and is not part of the Limit of Liability specified in Item 3 of the Declarations. Payment by the **Underwriter** of **Defense Cost** incurred on account of any **Claim** shall not serve to reduce the Limit of Liability stated in Item 3 of the Declarations, but the **Underwriter** is not obligated to pay any **Defense Cost** after the applicable Limit of Liability has been exhausted by payment of **Damages.**

E. The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period.**

## II. RETENTION CLAUSE

A. The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** or **Workplace Violence Act** which is in excess of the respective Retention stated in Item 4 of the Declarations Page. Such Retention shall be borne by the **Insured,** uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Organization** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so. A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts** and all related **Workplace Violence Acts.**

## III. DEFENSE AND SETTLEMENT

A. The **Insured** and not the **Underwriter** shall have the responsibility to defend any **Claim.** However, the **Insured** shall have the right, as soon as practicable after a **Claim** is first made, to tender the defense of such **Claim** to the **Underwriter.** Upon written notice to the **Underwriter** of such election by the **Insured** and subject to all of the provisions of this Section III. DEFENSE AND SETTLEMENT, the **Underwriter** shall undertake and manage the defense of such **Claim,** even if such **Claim** is groundless, false or fraudulent.

B. If the **Insured** has assumed the defense of a **Claim** pursuant to A. above, the **Underwriter** shall advance **Defense Cost** prior to the final disposition of a **Claim.** The **Insured** shall elect counsel of its choice subject to approval by the **Underwriter,** such approval shall not be unreasonably withheld. The **Underwriter** shall not be liable for **Defense Cost** incurred, settlements made or judgements admitted by the **Insured** without the **Underwriter's** prior written consent, which shall not be unreasonably withheld.

C. The **Underwriter** may investigate and, with the consent of the **Insured,** settle any **Claim** or **Workplace Violence Act** as the **Underwriter** deems expedient, but the **Underwriter** is not obligated to pay any **Loss** after the Limit of Liability has been exhausted.

D. In the event that a **Claim** is made against the **Insured** or a **Workplace Violence Act** occurs, the **Insured** shall take reasonable measures to protect their interests.

E. If more than one **Insured** is involved in a **Claim,** the **Underwriter** may, in its sole discretion, appoint separate counsel for one or more of such **Insureds** if there is a material (actual or potential) conflict of interest among any such **Insureds.**

PI-NPD-2 (01/02)

F. The **Insured** agrees to provide the **Underwriter** with all information, assistance and cooperation which the **Underwriter** reasonably requests and agree that in the event of a **Claim** or a **Workplace Violence Act,** the **Insured** will do nothing that may prejudice the **Underwriter's** position or its potential rights of recovery.

G. If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim,** then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Cost** incurred, up to the date of such refusal, plus 50% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 50% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4 of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability which is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by ten percent (10%). It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer. If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4 of the Declarations Page, even if consent is given to a subsequent settlement.

IV. NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Underwriter** at the following address:

> Philadelphia Insurance
> Companies One Bala Plaza,
> Suite 100
> Bala Cynwyd, Pennsylvania
> 19004 Attention: Claims
> Department

The date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. Any notice to the **Underwriter** shall specify the Part(s) of this Policy under which the notice is being given and shall be treated as notice only under such specified Part(s).

A. In the event that a **Claim** is made against the **Insured** or a **Workplace Violence Act** occurs, the **Insured** shall, as a condition precedent to the obligations of the **Underwriter** under this Policy, give written notice of such **Claim** or **Workplace Violence Act** as soon as practicable to the **Underwriter** during this **Policy Period,** or, if applicable, during any Extension Period, but, not later than 60 days after the expiration date of this Policy or any Extension Period, if applicable.

B. If during this **Policy Period** an **Insured** first becomes aware of any circumstances which may subsequently give rise to a **Claim** being made against any **Insured** for a specific alleged **Wrongful Act,** and as soon as practicable thereafter, but before the expiration or cancellation of this Policy, gives written notice to the **Underwriter** of the circumstances and the reasons for anticipating such a **Claim,** with full particulars as to the **Wrongful Act,** dates and persons involved, then any **Claim** which is subsequently made against the **Insured** arising out of such **Wrongful Act** will be considered made during this **Policy Period.**

C. All **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts,** or the same or related **Workplace Violence Acts,** shall be deemed one **Loss** on account of a one **Claim** or one **Workplace Violence Act.** Such **Claim** or **Workplace Violence Act** shall be deemed to be

PI-NPD-2 (01/02)

first made or to have first occurred when the earliest of such **Claims** or **Workplace Violence Acts** were first made or first occurred.

V. CANCELLATION AND NON RENEWAL

    A.  The **Underwriter** may not cancel this Policy except for failure to pay premium when due, in which case 10 days written notice shall be given to the **Parent Organization** for such cancellation to be effective.

    B.  The **Parent Organization** may cancel this Policy for itself and all other **Insureds** by surrender of this Policy to the **Underwriter** or any of its authorized agents or by mailing to the **Underwriter** written notice stating when thereafter the cancellation shall be effective. If the **Parent Organization** cancels, earned premium shall be computed in accordance with the customary short rate table procedure.

    C.  The **Underwriter** shall not be required to renew this Policy; however, written notice of the **Underwriter's** intent to non-renew this Policy shall be sent to the **Parent Organization** at least 30 days prior to expiration of the **Policy Period.**

VI. REPRESENTATIONS AND SEVERABILITY

    A.  The **Insured** represent that the particulars and statements contained in the **Application** are true and agree that (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the **Underwriter** under this Policy; and (3) this Policy is issued in reliance upon the truth of such representations.

    B.  Except for material facts or circumstances known to the **Individual Insured** signing the **Application,** no statement in the **Application** or knowledge or information possessed by any **Insured** shall be imputed to any other **Individual Insured** for the purpose of determining the availability of coverage.

VII. SUBROGATION

    In the event of any payment under this Policy, the **Underwriter** shall be subrogated to the extent of such payment to all of the **Insured's** rights of recovery. The **Insured** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights and shall do nothing to prejudice or compromise such rights without the **Underwriter's** express written consent.

VIII. EXTENSION PERIOD

    A.  If the **Underwriter** refuses to renew this Policy the following will apply:

        For no additional premium, the **Underwriter** will provide a 60 day extension of the coverage granted under Part 1, 2, 3, and 5 of this Policy for any **Claim** first made against the **Insured** during the 60 days after the non-renewal date, but only with respect to any **Wrongful Act** committed before such non-renewal date and otherwise covered by this Policy (the "Automatic Extension"). This Automatic Extension shall not apply if the **Insured** has purchased similar insurance from the **Underwriter** or any other insurer covering such **Claim.**

        Upon expiration of the Automatic Extension, the **Parent Organization** shall have the right, upon payment of an additional 50%, 75%, 100% of this Policy's annual premium to an extension of the coverage granted by this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the expiration of the Automatic Extension, but only with respect to **Wrongful Acts** committed before the non-renewal date and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made prior to the expiration of the Automatic Extension. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

    B.  If the **Parent Organization** cancels or does not renew this Policy or the **Underwriter** cancels for

PI-NPD-2 (01/02)

nonpayment of premium, the following will apply:

The **Parent Organization** shall have the right, upon payment of an additional 50%, 75%, or 100% of this Policy's annual premium, to an extension of the cover granted under Parts 1, 2, 3 and 5 of this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the date of such cancellation or non-renewal, but only with respect to any **Wrongful Acts** committed before the date of such cancellation or non-renewal and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made within 60 days following the date of such cancellation or non-renewal. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

If the **Underwriter** cancels for the non-payment of premium, the **Parent Organization** may purchase the Extension Period only after any earned premium due to the **Underwriter** is paid within 10 days after the date of cancellation or Policy expiration, whichever comes first.

C.   All premium paid with respect to an Extension Period shall be deemed fully earned as of the first day of the Extension Period. For the purpose of this Section VIII, any change in premium or terms on renewal shall not constitute a refusal to renew.

## IX. CHANGES

Except by written endorsement issued to the **Insured** forming a part of this Policy, nothing shall effect a change in or addition to the provisions of this Policy. Furthermore, under no circumstances shall the **Underwriter** be deemed to have waived or be estopped from asserting any right under this Policy, at law, or in equity respecting any **Claim** or **Workplace Violence Act,** except as stated in writing by the **Underwriter's** authorized Claims Department representative.

## X. ASSIGNMENT

Assignment of interest in this Policy shall not bind the **Underwriter** until the **Underwriter's** consent is endorsed hereon.

## XI. AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this Policy, the **Insured** agrees that the **Parent Organization** shall act on behalf of any **Insured** with respect to the giving and receiving of any return premiums and notices that may become due under this Policy. Notice to the **Parent Organization** shall be directed to the individual named in the **Application,** or such other person as shall be designated by the **Parent Organization** in writing. Such notice shall be deemed to be notice to any **Insured. The Parent Organization** shall be the agent of any **Insured** to effect changes in this Policy.

## XII. OTHER INSURANCE

If the **Insured** has any other insurance for **Claims** or **Workplace Violence Acts** covered hereunder, the insurance provided by this Policy shall be excess over such other insurance, regardless of whether such other insurance is collectible or designated as primary or excess.

## XIII. TERMS OF POLICY CONFORMED TO STATUTE

Terms of this Policy which are in conflict with the statutes of any state in which this Policy is issued are hereby amended to conform to such statutes.

## XIV. ACCEPTANCE

This Policy embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance

PI-NPD-2 (01/02)

XV. ACTION AGAINST THE UNDERWRITER; ARBITRATION

    A.  No person or entity shall have any right under this Policy to join the **Underwriter** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Underwriter** be impleaded by the **Insured** or their legal representatives. Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Underwriter** of its obligations hereunder.

    B.  Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter,** shall be submitted to binding arbitration. The rules of the American Arbitration Association shall apply except with the respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such **Insured,** one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

XVI. CHANGE IN OWNERSHIP OR CONTROL

    A.  If after the inception of the **Policy Period:**

        1.  the **Organization** merges into or consolidates with another entity such that the other entity is the surviving entity; or

        2.  another entity or person or group of entities and/or persons acting in concert acquires more than fifty percent (50%) of the assets of the **Organization;** or

        3.  another entity or person or group of entities and/or persons acting in concert acquires the right to elect or select a majority of the **Organization's** directors or trustees;

    (1.,2., and 3. above hereinafter referred to as the "Merger"), then coverage under Parts 1, 2, 3, and 5 of this Policy shall remain in force, but only for **Claims** made during the **Policy Period** (or the Extension Period, if purchased) for a **Wrongful Acts** committed prior to the effective date of the Merger and only if the following conditions are met:

        1.  the **Insured** provides written notice of the Merger to the **Underwriter** within 45 days of the effective date of such Merger; and

        2.  the **Insured** provides the **Underwriter** with such information as the **Underwriter** deems necessary.

    If **Insured** fails to meet conditions 1. & 2. above, this Policy shall be deemed cancelled by the **Underwriter** as of the effective date of the Merger and the **Underwriter** shall return any unearned premium on a pro-rata basis. The **Insured** shall have the right to purchase the Extension Period.

    Coverage under Part 4 of this Policy shall cease with respect to any **Workplace Violence Act** occurring after the effective date of the Merger.

    B.  If after the inception of the **Policy Period:**

        1.  the **Organization** acquires or assumes more than fifty percent (50%) of the assets, liabilities, or equity of, or merges with any for profit entity or creates a for-profit subsidiary, no coverage shall be afforded under this Policy for **Claims** arising out of, based upon or attributable to such transaction unless all of the following conditions are met:

            a.  the **Underwriter** receives from the **Parent Organization** full details of such transaction; and

            b.  the **Underwriter,** at its sole discretion, agrees by written endorsement to this Policy to provide coverage to the for-profit entity upon such terms, conditions and limitations as it may require.

XVII. TERRITORY AND VALUATION

    This Policy shall extend to any **Wrongful Act** committed or any **Workplace Violence Act** occurring anywhere in the world.

    All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgement is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United

PI-NPD-2 (01/02)

States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgement is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

XVIII. TWO OR MORE COVERAGE PARTS OR POLICIES ISSUED BY THE UNDERWRITER.

It is the **Underwriter's** stated intention that the various coverage parts or policies issued to the **Parent Organization** by the **Underwriter,** or any affiliated company, do not provide any duplication or overlap of coverage for the same **Claim** or **Workplace Violence Act.** Notwithstanding the other insurance provision, if this Policy and any other policy issued to the **Parent Organization** by the **Underwriter,** or any affiliated company, apply to the same **Wrongful Act, Workplace Violence Act,** professional incident, occurrence, offense, accident or **Loss,** then the maximum Limit of Liability under all such policies combined shall not exceed the highest applicable Limit of Liability under any one policy.

XIX.  ALLOCATION

If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred either because a **Claim** includes both covered and uncovered matters, or because a **Claim** is made against both the **Individual Insured** and/or the **Organization,** and others, the **Insured** and the **Underwriter** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered loss. Any such allocation shall be based upon the relative legal exposures of the parties to covered and uncovered matters.

PI-NPD-8 (1-02)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT
CAREFULLY.**

# SHARED LIMITS ENDORSEMENT

This endorsement modifies and is subject to the insurance provided under the following:

FLEXIPLUS FIVE

It is agreed the combined/shared Limit of Liability available for any **Claim** under Part(s) 1
and any **Claim** under Part(s) 2          shall be $   1,000,000.

Notwithstanding the foregoing, the Limit of Liability available for any **Claim** under a coverage Part
shall also be subject to such Parts Limit of Liability as stated in Item 3 of the Declarations.

Page 1 of 1

PI-NPD-25 (1-02)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## PROFESSIONAL SERVICES EXCLUSION (SUPERVISION CARVE-OUT)

This endorsement modifies and is subject to the insurance provided under the following:

FLEXIPLUS FIVE

The Policy is amended as follows:

With respect to coverage under Part 1, the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the **Insured's** performance of or failure to perform professional services for others.

Provided, however, that the foregoing shall not be applicable to any derivative action **Claim** alleging failure to supervise those who performed or failed to perform such professional services.

PI-NPD-27 (1-02)

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>

## SEXUAL ABUSE EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

FLEXIPLUS FIVE

The Policy is amended as follows:

With respect to coverage under Part(s) 1 & 2, the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any act of sexual misconduct, sexual molestation or physical or mental abuse of any non-**Insured**.

PI-NPD-52 (12/03)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# AMENDMENT OF EXCLUSIONS

This endorsement modifies insurance provided under the following:

FLEXI PLUS FIVE

With regard to Part 1 (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act  (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for retaliation; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 2 (**EMPLOYMENT PRACTICES LIABILITY INSURANCE**), section III (EXCLUSIONS), item B. is replaced by:

B.  for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act  (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 6 (**COMMON POLICY DEFINITIONS**), is supplemented by:

**Earned Wages** means wages or overtime pay for services rendered.

PI-NPD-66 (6/04)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**.

## EMPLOYMENT PRACTICES LIABILITY
## THIRD PARTY SUB-RETENTION ENDORSEMENT

This endorsement modifies insurance provided under the following:

FLEXI PLUS FIVE

In consideration of the premium paid for this Policy, it is agreed as follows:

With respect to coverage under Part 2 Employment Practices Liability, any **Claim** made against any **Insured** which is brought by or on behalf of any **Third Party**, Item 4. of the Declarations, is amended to read as follows:

Item 4. Retention:

(B) Part 2:  Employment Practices: $25,000 for each **Claim**

PI-NPD-82 (09/05)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## PRO-PAK ELITE ENHANCEMENT

This endorsement modifies insurance provided under the following:

FLEXI PLUS FIVE

**1. D&O COVERAGE ENHANCEMENTS**

> **Part 1,** Not-for-profit Organization Directors & Officers Liability Insurance, section III. EXCLUSIONS is amended according to the following:

>> 1. In Item B., items 3. and 4. are deleted.

>> 2. Item C. will not apply to **claims** with respect to coverage provided under INSURING AGREEMENTS, item A.

**2. AMENDMENT OF DEFINITIONS**

> **Part 6,** Common Policy Definitions, is amended according to the following:

> A.  Item B., **Claim**, will also mean any criminal proceeding commenced by the return of an indictment.

> B.  With respect to **Claims** brought under **Part 2** of this policy only, Item B., **Claim**, will also mean proceedings before the Equal Employment Opportunity Commission or any similar governmental agency.

> C.  Solely with respect to Parts 1, 2, 3 and 5, Item C. **Damage** is replaced with following:
> C. **Damage** means a monetary judgment, award or settlement including punitive or exemplary damages (including pre and post judgment, interest thereon) to the extent such punitive and exemplary damages are insurable under applicable law of any jurisdiction which has a substantial relationship to the **Insured** or to the **Claim** seeking such damage and which is most favorable to the insurability of such damage and then only on an amount not greater than the amount of compensatory damages awarded in such **Claim**.

> D.  Item D., **Defense Cost** will also mean any pre-judgment interest and post-judgment interest on the portion of any judgment for which the **Underwriter** is liable under this policy, until the **Underwriter** has tendered or deposited in court or otherwise such judgment amount for which the **Underwriter** is liable.

> E.  With respect to **Claims** brought under **Part 2** of this policy only, Item F., **Individual Insured**, will also mean any independent contractor working on behalf of the **Organization** in the capacity of a director or officer; solely if the **Organization** has agreed in writing to indemnify the independent contractor prior to the occurrence of the **Employment Practices Act** which is the basis of the **Claim**.

> F.  Item F., **Individual Insured**, will also mean the lawful domestic partner of a director, officer, governor,  trustee, or equivalent executive of the **Organization**, but only for actual or alleged **Wrongful Acts** of such executive for which such domestic partner may be liable as the domestic partner of such executive.
> G.  Item I., **Loss** will also include fines and penalties resulting from a **claim** provided that they are brought:

PI-NPD-82 (09/05)

(a) seeking coverage for an **Excess Benefit Transaction Excise Tax**; or

(b) alleging violations of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C> 1396dd, et seq., and any other similar state or local statute.

With respect to coverage granted within this Item G., the following provisions will apply:

1. The Limit of Liability specified in the Declarations is replaced by $100,000 per **claim** and $100,000 for all **claims** in the policy period.  This Limit of Liability will apply to the total of all **loss** and **defense costs** combined, even if the policy is endorsed to provide otherwise. This application of **defense costs** included within the Limit of Liability, for all coverage granted by item 1. above, will supersede any other provision attached to this policy.

   Further, the **Underwriter** will not be liable for **Damages** arising out of an **Excess Benefit Transaction Excise Tax**, as provided herein, for amounts exceeding $10,000 that an **Individual Insured** is obligated to pay as a result of a **Claim**.

2. Coverage will exist if and only to the extent that indemnification is provided by the **Organization** to any **Insured** for any **Excess Benefit Transaction Excise Tax**.

3. The **Underwriter** will not be liable to make payment for any **Loss** or **Defense Cost** in connection with any **Claim** for any Excise Tax imposed by the Internal Revenue Service on any Disqualified Person for any **Excess Benefit Transaction**.

4. **Excess Benefit Transaction** means an "excess benefit transaction" as that terms is defined in the Taxpayer Bill of Rights 2, P.L. 104-168.

5. **Excess Benefit Transaction Excise Tax** means any excise tax imposed by the Internal Revenue Service on an **Individual Insured** as a result of the **Individual Insured's** participation in an **Excess Benefit Transaction.**

H. Item M., **Subsidiary**, will also mean any not-for-profit entity for which, on or before the inception of the **Policy Period**, the **Parent Organization** has the right to elect or select a majority of the directors or trustees, provided such entity is identified as an Affiliate in the **Application**.

## 3. AMENDMENT OF EXCLUSIONS

**Part 7**, Common Policy Exclusions, is amended according to the following:

A. Item C. will not apply to **claims** with respect to coverage provided under **Part 1**, INSURING AGREEMENTS, item A.

B. Items D., G., and H. are deleted.

C. Item F.2. is replaced by:

2. any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance, with a similar type of coverage, prior to inception of this Policy; or

D. Item F.3. is deleted.

PI-NPD-82 (09/05)

E. Item J. will not apply to any **claim** brought as a derivative action, or similar action, on behalf of the **Organization**, provided the **claim** is brought without the assistance of any current or former **Individual Insured**.

## 4. AMENDMENT OF CONDITIONS

**Part 8,** Common Policy Conditions, is amended according to the following:

A. ORDER OF PAYMENTS

It is understood and agreed that if **Loss** shall be payable under more than one of the INSURING AGREEMENTS in **Part 1** of this policy, then the **Underwriter** shall, to the maximum extent practicable and subject at all times to the **Underwriter's** Limits of Liability as set forth in the Declarations, pay such **Loss** as follows:

(1) first, the **Underwriter** shall pay that **Loss**, if any, which the **Underwriter** may be liable to pay on behalf of the **Individual Insureds** under INSURING AGREEMENT item A;

(2) second, the **Underwriter** shall pay that **Loss**, if any, which the **Underwriter** may be liable to pay on behalf of the **Organization** for **claims** made against **Individual Insureds** and indemnified by the **Organization** under INSURING AGREEMENT item B.; and

(3) third, the **Underwriter** shall make such other payments which the **Underwriter** may be liable to pay on behalf of the **Organization** for **claims** made against the **Organization** under INSURING AGREEMENT, item C.

B. AMENDMENT OF SEVERABILITY

Item VI. REPRESENTATIONS AND SEVERABILITY is replaced by the following:

A. In granting coverage to the **Insureds** under this Policy, the **Underwriter** has relied upon the declarations and statements in the written application(s) for this Policy. Such declarations and statements are the basis of the coverage under this Policy and shall be considered as incorporated in and constituting part of this Policy.

B. Any written application(s) shall be construed as a separate application(s) for coverage by each **Insured**. With respect to the declarations and statements in such application(s):

(1) no fact pertaining to or knowledge possessed by any **Individual Insured** shall be imputed to any other **Individual Insured** for the purpose of determining if coverage is available; and

(2) only facts pertaining to and knowledge possessed by the Chief Financial Officer, President, Executive Director or Chairperson of any part of the **Organization** or any other individual signing such application(s) shall be imputed to the **Organization** for the purpose of determining if coverage is available.

PI-NPD-82 (09/05)

C. FULL ALLOCATION

Solely with respect to **Claims** for which the **Insured** has tendered control of the defense to the **Underwriter**, per **Part 8 Common Policy Conditions**, item **III.A.**, item **XIX.** ALLOCATION is replaced by:

If, in any **Claim**, **Insureds** who are afforded coverage for such **Claim** incur an amount consisting of both **Loss** that is covered by this policy and also **Loss**  that is not covered by this Policy because such **Claim** includes both covered and uncovered matters or covered and uncovered parties, then coverage shall apply as follows:

(1) **Defense Costs**: one hundred percent (100%) of reasonable and necessary **Defense Costs** incurred by such **Insured** and authorized by the **Underwriter** from such **Claim** will be considered covered **Loss**; and

(2) loss other than **Defense Costs**: all remaining loss incurred by such **Insured** from such relative legal exposures of the parties to such matters.

## 5. ADDITIONAL COVERAGES

The following is added as Part 9 of the Policy:

**PART 9**
**ADDITIONAL COVERAGES**

I.   INSURING AGREEMENTS

A.   IDENTITY THEFT

The **Underwriter** will reimburse any Director or Officer of the **Organization** for **Identity Theft Expenses** incurred in specific response to any **Identity Theft** first discovered and reported to the **Underwriter** during the **Policy Period;** provided that the **Identity Theft** began to occur after the effective date of the **Insured's** first *FLEXI PLUS FIVE* policy purchased from the **Underwriter**. The maximum reimbursement for this coverage is $1,500 for the **Policy Period**. No Retention will apply to this coverage.

B.   TERRORISM TRAVEL

The **Underwriter** will reimburse any present Director or Officer of the **Organization** in the event of a **Certified Act of Terrorism** that occurs during the policy period if it necessitates that he/she incur **Emergency Travel Expenses.**  The maximum reimbursement for this coverage is $1,000 for the **Policy Period** . No Retention applies to this coverage.

C.   REALTOR CONSULTATION REIMBURSEMENT

The **Underwriter** will reimburse the **Insured** any realtor's fee or real estate consultant's fee necessitated by the **Insured's** need to relocate due to the **Unforeseeable Destruction** of the **Insured's** primary location, listed on the Declarations Page, during the **Policy Period.**  The maximum reimbursement for this coverage will be $1,000 for the **Policy Period**. No Retention applies to this coverage.

PI-NPD-82 (09/05)

D.     THEFT OF WORK MATERIALS FROM PERSONAL AREAS

The **Underwriter** will reimburse any **Insured** 50% of their personal or business property policy's deductible for any theft involving **Work Materials** that are stolen from the **Insured's Personal Areas** during the **Policy Period**, provided that the theft is covered by other insurance.  No reimbursement is applicable under this section for thefts for which no other insurance policy provides a settlement.  The maximum reimbursement for this coverage is $1,000 for the **Policy Period**. No Retention applies to this coverage.

E.     SPECIAL RISK

The **Underwriter** will reimburse any Director or Officer, or spouse thereof, reasonable fees incurred in response to the kidnapping of a Director or Officer, or spouse thereof, during the **Policy Period,** provided that the kidnapping occurs within the United States.  Coverage under this section G is subject to a maximum reimbursement of $25,000.  No Retention applies to this coverage.

Reasonable fees will include:

1) fees and expenses of an independent negotiator or consultant retained with prior approval of the **Underwriter**;

2) costs of travel and accommodations incurred by any **Individual Insured** which become specifically necessary due to the applicable kidnapping; and

3) the reward paid by any **Insured** to an informant for information not otherwise available which leads to the arrest and conviction of persons for the applicable kidnapping.

F.     KEY INDIVIDUAL REPLACEMENT

If during the **Policy Period**, the Executive Director, or equivalent officer, dies or becomes totally and permanently disabled, the **Underwriter** will reimburse the **Private Company** up to $5,000 for expenses charged by a recruiter or expended by the **Organization** on advertising to search for a replacement.

## II. DEFINITIONS

A.     **Identity Theft** means the act of knowingly transferring or using, without lawful authority, a means of identification of any **Insured** with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

B.     **Identity Theft Expenses** means:

a. Costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies.

b. Costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors.

PI-NPD-82 (09/05)

  c. Loan application fees for re-applying for a loan or loans when the original application is re-jected solely because the lender received incorrect credit information.

C. **Emergency Travel Expenses** means, while traveling in the course of the **Organization's** business, hotel expenses incurred which directly result from the cancellation of a scheduled transport, by train or air, by a commercial transportation carrier resulting directly from and within forty-eight hours of a **Certified Act of Terrorism** and the marginal increase in air or train fare which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to a terrorist incident.

D. **Certified Act of Terrorism** means any act that is certified by the Secretary, in concurrence with the Secretary of State, and the Attorney General of the United States (i) to be an act of terrorism; (ii) to be a violent act or an act that is dangerous to (I) human life; (II) property; or (III) infrastructure; (iii) to have resulted in damage within the United States, or outside the United States in the case of (I) an air carrier or vessel described in paragraph (5)(B); or (II) the premises of a United States mission; and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

E. **Unforeseeable Destruction** means damage resulting from a **Certified Act of Terrorist**, fire, crash or collapse which renders a premises completely unusable.

G. **Work Materials** means any equipment that is used by the **Insured** solely in the course of the **Organization's** business; inclusive of stores of data and client records.

H. **Insured's Personal Areas** means any residence or automobile owned or rented by any **Individual Insured.**

III. CONDITIONS

A. With respect to coverage under Part 9 of this Policy, the **Underwriter's** maximum aggregate liability under part 9 is $25,000.

B. The reimbursement amounts payable under Part 9 are in addition to the Limit of Liability as set forth in Item 3 of the Declarations Page.

IV. EXCLUSIONS

The Underwriter shall not be liable to make any payment under Part 9 as a result of any event:

a. arising out of, based on or attributable to any intentional or criminal act by any **Individual Insured**; or

b. arising out of, based on or attributable to any governmental action, nuclear activity, riot, flood or earthquake.

PI-SLD-001 (01/08)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

DIRECTORS AND OFFICERS LIABILITY

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Includes copyrighted material of the Insurance Services Office Inc., used with its permission.

# Exhibit B

STATE OF RHODE ISLAND                              SUPERIOR COURT
PROVIDENCE, SC.

THOMAS S. HEMMENDINGER,                    :
in his capacity as Receiver of PROVIDENCE  :
COMMUNITY ACTION PROGRAM, INC.             :
                                           :
          vs.                              :        C. A. NO.:
                                           :
FRANK CORBISHLEY and                       :
WILLIAM BENTLEY                            :

## COMPLAINT

### Parties and Jurisdiction

1.     Plaintiff Thomas S. Hemmendinger (hereinafter, "Receiver") is the court-appointed

Receiver of Providence Community Action Program, Inc. (hereinafter "ProCAP"), and brings this

action against defendants in his capacity as Receiver.

2.     Defendant Frank Corbishley was, at all times relevant to this action, the executive

director of ProCAP.

3.     Defendant William Bentley was, at all times relevant to this action, the assistant

director of ProCAP.

4.     The monetary amount claimed, exclusive of interest and costs, is sufficient to establish

the jurisdiction of this Court.

### Cause of Action

5.     As officers of ProCAP, defendants owed a fiduciary duty to ProCAP and a duty to

exercise due care in the performance of their duties and obligations to manage, direct, and supervise

the operations and finances of ProCAP.

6.     Defendants breached this duty and failed to exercise due care in that they:

1

a.     misappropriated funds designated for specific programs to pay expenses for unrelated programs;

b.     failed to implement necessary financial controls and procedures for ProCAP;

c.     failed to implement necessary management controls and procedures for ProCAP;

d.     failed to adequately supervise, manage, and control the activities of ProCAP employees with respect to the finances of ProCAP;

e.     failed to follow, and failed to ensure that other ProCAP employees followed, ProCAP's own practices and procedures for payment of expenses and other financial transactions;

f.     permitted ProCAP to make no-interest loans to employees, including no-interest loans to themselves;

g.     failed to adequately respond to or cure deficiencies noted in management letters that ProCAP received from its independent auditors;

h.     failed to enforce internal financial controls and internal management controls.

7.     As a direct and proximate result of defendants' breach of their fiduciary duty to ProCAP to exercise due care, ProCAP accumulated millions of dollars in debt that it could not pay, became insolvent, and was placed into receivership on December 14, 2011.

8.     Plaintiff was appointed temporary receiver of ProCAP on December 14, 2011, and was appointed permanent receiver of ProCAP on January 4, 2012.

9.     As Receiver of ProCAP, plaintiff is empowered and authorized, as the agent of the Court, to assert claims for damages against any parties who may be liable to ProCAP for damages, including defendants.

WHEREFORE, plaintiff demands judgment against defendants for compensatory damages, interest, and costs.

2

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury and designates John S. Foley as trial counsel.

THOMAS S. HEMMENDINGER, Receiver
By his attorney,

John S. Foley, Esq.                    Bar #2060
FoleyCerilli, P.C.
56 Pine Street, Suite 200
Providence, RI 02903
Telephone:  (401) 272-7800
Facsimile:  (401) 274-2780
john@foleycerilli.com

Dated:  6/13/14

3